Raymond McGUIRE, et al., Plaintiffs,

v.

AMERITECH SERVICES, INC., et al., Defendants.

No. C–3–99–661.

United States District Court, S.D. Ohio, Western Division.

Jan. 15, 2003.

Jon Paul Rion, John H Rion and Associates, David Michael Deutsch, David M Deutsch Co., LPA, Dayton, OH, for Plaintiffs.

Marc Gregory Pera, Porter Wright Morris & Arthur, Jonathan Hollingsworth, Washington & Hollingsworth, Thomas Allen Knoth, Thompson Hine, Victor Terrell Whisman, Montgomery County Prosecutor's Office, Jeffrey Charles Turner, Jenks Surdyk Oxly Turner & Dowd Co LPA, Dayton, OH, Leslie M Smith, Julie B Ruder, Kirkland & Ellis, Chicago, IL, James B Niehaus, Frantz Ward LLP, Cleveland, OH, Jay M Vogelson, Stutzman & Bromberg, Dallas, TX, Daniel L Clark, Jr., Philomena M Dane, Squire Sanders & Dempsey, Joseph Matthew Mancini, Charissa Diane Payer, Ohio Attorney General, Gregory Paul Dunsky, United States Attorney's Office, Steven Gerard LaForge, Mark David Landes, Isaac Brant Ledman & Teetor, Columbus, OH, for Defendants.

EXPANDED OPINION; DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN PART STATE DEFENDANTS' MOTION TO DISMISS (DOC. # 41); SUSTAINING IN PART AND OVERRULING IN PART TELEPHONE DEFENDANTS' MOTION TO DISMISS (DOC. # 42); SUSTAINING IN PART AND OVERRULING IN PART COUNTY DEFENDANTS' MOTION TO DISMISS (DOC. # 43); THIS ACTION IS STAYED PENDING THE RESOLUTION OF BANKRUPTCY PROCEEDINGS INITIATED BY DEFENDANT MCI WORLDCOM NETWORK, INC., NOW KNOWN AS WORLDCOM, INC., OR UNTIL SAID DEFENDANT IS VOLUNTARILY DISMISSED; PLAINTIFFS DIRECTED TO NOTIFY THE COURT, WITHIN 20 DAYS OF DATE, OF WHETHER THEY DESIRE TO DISMISS SAID DEFENDANT FROM THIS LITIGATION

RICE, Chief Judge.

Plaintiffs, representing a proposed class of family members, friends, attorneys, and bailbondsmen of inmates at state and county correctional institutions throughout Ohio, have filed an Amended Complaint (Doc. # 21), in which they claim that certain telecommunication companies have conspired with the State of Ohio and certain counties of Ohio to create exclusive contracts for inmate telephone service, that such contracts restrict inmates' telephone privileges to collect calls, and that, as a result, they (Plaintiffs), who bear the cost of the collect calls, are charged excessive rates and surcharges. In so acting, Plaintiffs claim, Defendants have violated the Sherman Antitrust Act, 15 U.S.C. § 1, et seq., the Telecommunications Act, 47 U.S.C. § 151, et seq.,[1] and certain of their constitutional rights, violations of which are actionable under 42 U.S.C. § 1983. Plaintiffs also state a related claim under the antitrust laws of Ohio, Ohio Rev.Code § 1331.01, et seq. ("Valentine Act"), over which the Court has jurisdiction pursuant to 28 U.S.C. § 1367(a).

Plaintiffs named in the Amended Complaint are: Raymond McGuire, Kim Rayford, Paul Null, Sandra Null, Thomas Short, Algie Harris, Rebia Harris, Cindy Partida, Dennis E. Gump, George Cleere, Amanda Cleere, Mildred Lawson, and Emmit Lawson (collectively, "Plaintiffs").

Defendants are: Ameritech Services, Inc., GTE Telecommunication Services, Inc., Ameritel, Evercom Systems, Inc., and MCI Worldcom Network, Inc. (collectively, "Telephone Defendants"); State of Ohio, Ohio Department of Rehabilitation and Corrections ("ODRC"), and Reginald A. Wilkinson, in his individual capacity, and in his official capacity as Director of the ODRC (collectively, "State Defendants"); the Ohio Counties of Miami, Greene, Madison, and Butler, along with their Commissioners and Sheriffs, and the County Commissioners of Montgomery County (collectively, "County Defendants").[2] Plaintiffs also named as Defendants other Unknown Counties of Ohio, and John and Jane Doe Commissioners, Sheriffs, Telephone Companies, and Rehabilitation and Correction Institutions.

---

**1.** Plaintiffs erroneously cite 21 U.S.C. § 151, et seq., in their jurisdictional pleadings as the "Telecommunications Act." (Amend. Compl. ¶ 4.) Title 21 of the United States Code is concerned with Food and Drug matters, and § 151 in particular is concerned with the sale or barter of worthless or harmful products for domestic animals, a subject that does not appear to be at issue herein.

**2.** Montgomery County was also named, but has since been dismissed. (See Doc. # 52.)

Plaintiffs have set forth eleven counts. In Count I, they allege that State Defendants and Telephone Defendants have conspired to set excessive calling rates for prison inmates in violation of the Equal Protection Clause of the Fourteenth Amendment. Count II alleges that a similar conspiracy exists between County Defendants and the Telephone Defendants, also in violation of the Equal Protection Clause. Counts III and IV allege that Defendants, by their actions of setting high calling rates, have placed an undue burden on their (Plaintiffs') rights of association and freedom of speech, in violation of the First Amendment. Counts V and VI allege that the actions of Defendants have deprived Plaintiffs of their procedural and substantive due process protections, in violation of the Due Process Clause of the Fourteenth Amendment. Counts VII and VIII allege that Defendants' actions impair certain contracts, in violation of Article I, § 10, of the Constitution ("Contracts Clause"). Count IX alleges that Defendants, through their conspiratorial actions, have violated § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Count X alleges that Telephone Defendants have violated the Telecommunications Act, 47 U.S.C. §§ 201(b) & 202(a). Finally, in Count XI, Plaintiffs allege that Defendants conspired in violation of Ohio's Valentine Act, Ohio Rev.Code § 1331.01, *et seq.*

Currently before the Court are the Motions of the State Defendants (Doc. # 41), Telephone Defendants (Doc. # 42), and County Defendants (Doc. # 43) to Dismiss the Amended Complaint, pursuant to Rule 12(b)(1) & (6) of the Federal Rules of Civil Procedure. After noting the proper standard for review of motions to dismiss and setting forth the underlying facts, the Court will consider the individual Motions. With the exception of Count X, which concerns only the Telephone Defendants, to the extent the Amended Complaint concerns agreements between Telephone and State Defendants, the Court will consider their Motions together; likewise, to the extent the Amended Complaint concerns agreements between Telephone and County Defendants, the Court will consider their Motions together.

For the reasons expressed herein, the several Motions shall be SUSTAINED in part and OVERRULED in part.

### I. Standards Governing Rule 12(b)(1) & (6) Motions to Dismiss

Pursuant to Rule 12(b)(6), the Court may only consider the facts as pled in the Complaint in deciding whether the Plaintiffs have stated a valid claim. *See Nelson v. Miller,* 170 F.3d 641, 649 (6th Cir.1999). "A court should not dismiss a plaintiff's complaint under Rule 12(b)(6) unless, after construing the complaint in the light most favorable to the plaintiff and accepting all factual allegations as true, the court determines that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Id.* (citation omitted); *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

Regarding motions brought under Rule 12(b)(1), in *Ohio Nat'l Life Ins. Co. v. United States,* 922 F.2d 320 (6th Cir.1990), the Sixth Circuit, at 325, laid out the procedural framework for such:

Rule 12(b)(1) motions to dismiss based upon subject matter jurisdiction generally come in two varieties. A facial attack on the subject matter jurisdiction alleged by the complaint merely questions the sufficiency of the pleading. In reviewing such a facial attack, a trial court takes the allegations in the complaint as true, which is a similar safeguard employed under 12(b)(6) motions to dismiss. On the other hand, when a court reviews a complaint under a factual attack, as here, no presumptive truthful-

ness applies to the factual allegations. Such a factual attack on subject matter jurisdiction commonly has been referred to as a "speaking motion." *See generally* Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1364, at 662–64 (West 1969). When facts presented to the district court give rise to a factual controversy, the district court must therefore weigh the conflicting evidence to arrive at the factual predicate that subject matter jurisdiction exists or does not exist. In reviewing these speaking motions, a trial court has wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts. (Citations omitted.)

Importantly, in considering facts that bear on its subject matter jurisdiction, the Court does not convert a Rule 12(b)(1) motion into a motion for summary judgment, as facts which bear on jurisdiction are not the same as fact which bear on the merits.[3] Herein, to the extent they rely upon Rule 12(b)(1), Defendants have presented only facial attacks on the Court's subject matter jurisdiction. As such, be it under Rule 12(b)(1) or (6), the Court shall presume the truth of the facts as alleged.

## II. *Factual Background*

■ As just noted, for purposes of ruling on Defendants' Motions, the Court shall draw all of its underlying facts from the allegations set forth in Plaintiffs' Amended Complaint, accept them as true for the moment, and construe them in a light most favorable to Plaintiffs.[4]

Inmates housed at correctional institutions operated and managed by the State of Ohio or the counties of Ohio have a single means of calling out to their friends, family, and attorneys and the like: by collect call. Typically, each institution will contract on an exclusive basis with a single telephone company for the provision of a collect calling service. In consideration for the exclusive contract, the telephone company agrees to remit up to 50% of its revenues therefrom to the institution with which it is contracted. The commissions realized by the State and various counties amount to millions of dollars a year.

The impact of these exclusive contracts on those who most frequently communicate with inmates, to wit, family, friends, attorneys, and so forth, as represented herein by Plaintiffs, is obvious. Collect calling rates are higher than regular person-to-person calling rates, the result of which is that it costs substantially more, on average, to converse by telephone with an inmate than it does with a non-inmate. In the case of attorneys and bailbondsmen, and others whose businesses depend upon communicating with inmates, these high

---

**3.** For example, were diversity asserted as the basis for the Court's original jurisdiction, *see* 28 U.S.C. § 1332, and the diverse citizenship of one of the defendants disputed, the Court would be required to make factual findings on the citizenship issue pursuant to a motion to dismiss brought pursuant to Rule 12(b)(1), given that it would bear on its jurisdiction. In doing so, nothing would require it to consider the merits of the underlying allegations, as it would were it ruling on a motion for summary judgment.

**4.** Contrary to the suggestion of Plaintiffs, this does not mean that *all* of the pleadings must be accepted as true; the rule only applies to allegations of *fact*. Where the pleadings state conclusions of law, whether they are correct is for the Court to decide on its own. In other words, a conclusion of law is not presumed true merely because Plaintiffs state it in their Amended Complaint as if it were a fact. For example, the "allegations" that the agreements at issue "constitute a confiscation of plaintiff's property" (Amend.Compl.¶ 78), and that Defendants have "unreasonably restrained trade" (*id.* ¶ 90), are conclusions of law, and the Court need not give them any deference in ruling on Defendants' Motions to Dismiss.

rates increase overhead costs. For family members and friends, these high rates often make telephone communications financially burdensome, a fact which is especially troubling to those who live at too great a distance to visit in person on a regular basis.

Plaintiffs find the arrangement particularly frustrating, given that cheaper calling services are available on the market, including 1–800 services and prepaid debit cards, but are refused to Ohio inmates. Furthermore, Plaintiffs are prohibited from communicating with inmates per the terms of their own residential phone service plans. In addition, the customer service provided by the respective Telephone Defendants for the collect calling plans they provide to the various correctional institutions is substantially curtailed, in comparison to the customer service provided for regular residential service, and Plaintiffs are frequently told that complaints about service cut-offs should be directed to the particular correctional institutions, not the telephone company servicing the line.

The following points of law are pertinent, and may be considered herein. The ODRC maintains and operates Ohio's correctional institutions.[5] *See* Ohio Rev.Code § 5120.05; *id.* § 121.02(P). As its Director, Wilkinson is in charge of such operations and management, and has the authority to prescribe all rules and regulations related thereto. *See id.* § 5120.01; *id.* § 121.02(P). Although sheriffs administer their own county jails, *see id.* § 341.01, the ODRC's Division of Parole and Community Services ("DPCS"), *see id.* § 5120.06(A)(2), is vested with the authority to investigate and supervise their operations.[6] *See id.* § 5120.10(D)(1). In other words, all correctional institutions in Ohio, state prisons and local jails alike, are either operated by or supervised by the ODRC, and its Director has the exclusive authority to prescribe rules and regulations therefor.

Related to inmate communications at state prisons, the ODRC has prescribed rules for general visitation (Ohio Admin. Code § 5120–9–15), news media visitation (*id.* § 5120–9–16), receiving and sending mail (*id.* §§ 5120–9–17 & 5120–9–18), and attorney visitation (*id.* § 5120–9–20). Comparable provisions are provided for in local jails. (*See id.* §§ 5120:1–8–06 & –07, 5120:1–10–06 & –07, and 5120:1–12–06 & –07.) There are no allegations that inmates are denied the benefit of any of these provisions.

There is no published regulation specifically pertaining to inmate telephone use at state penitentiaries, but Plaintiffs' pleadings can be accepted herein for purposes of establishing that Ohio has implemented a collect calling phone system for inmates' use, and that the system at each institution is serviced by a single telephone service provider. In full service county jails, which are equipped to house inmates for more than five days, with certain exceptions for the due process rights of inmates

---

**5.** Ohio Rev.Code § 2967.01 defines "state correctional institution" as "any institution or facility that is operated by the [ODRC] and that is used for the custody, care, or treatment of criminal, delinquent, or psychologically or psychiatrically disturbed offenders." The discretion to name and operate such facilities is that of the ODRC. Ohio Rev.Code § 5120.05.

**6.** "Full service jails" are local jails which may detain persons for more than five days. Ohio

Admin. Code § 5120:1–7(A)(1). "Five-day facilities" are local jails which may detain persons for a maximum of five days. *Id.* § 5120:1–7(A)(2). "Eight-hour holding facilities" may detain persons up to eight hours. *Id.* § 5120:1–7(A)(3). In addition, non-violent misdemeanants who have been sentenced may be held in "minimum security misdemeanant jails," without respect to duration. *Id.* § 5120:1–7(A)(4).

who have yet to be sentenced, inmates are limited to a single local call per week, and a single long-distance *collect call* per week. *See* Ohio Admin. Code § 5120:1–8–08(B)(3). All moneys which the ODRC receives as commissions from telephone contracts established for inmate use, at the institutions it operates, are to be set aside for a "prisoner program fund," and may only be used for purposes prescribed by law. *See* Ohio Rev.Code § 5120.132(A). All such purposes are related to the general welfare of prison inmates. *See id.*

There is no allegation that Ohio inmates, either in the state prisons or the county jails, are given inadequate access to the telephone.

The Court will consider the Motions of State Defendants and Telephone Defendants together, as they relate to the agreements between them, and then turn to that of County Defendants and Telephone Defendants, as they relate to their agreements. It notes in passing that other courts across the country have dismissed identical claims. For several recent examples, *see Miranda v. Michigan,* 168 F.Supp.2d 685 (E.D.Mich.2001) (ruling on summary judgment); *Daleure v. Kentucky,* 119 F.Supp.2d 683, 691 (W.D.Ky. 2000) (ruling on Rule 12(b) motion); *Arsberry v. Illinois,* 244 F.3d 558, 566 (7th Cir.) (affirming Rule 12(b) dismissal), *cert. denied,* 534 U.S. 1062, 122 S.Ct. 661, 151 L.Ed.2d 576 (2001).

III. *Ohio and Telephone Defendants' Motions to Dismiss (Doc. # s 41 & 42)*

At the outset, it is worth noting that what Plaintiffs are requesting is relief from what they consider exorbitant rates charged whenever they opt to accept a collect call from an inmate. At bottom, this is a request for relief from the internal policies of the various correctional institutions implicated herein. The Court is thus being asked to superimpose its views upon the business of these institutions. As the Supreme Court has stated, "the judiciary is 'ill equipped' to deal with the difficult and delicate problems of prison management." *Thornburgh v. Abbott,* 490 U.S. 401, 407–08, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) (citation omitted). While this principle has limited relevance to a Rule 12(b) analysis, the Court makes note of it here to highlight the significant burden which Plaintiffs will ultimately have to overcome to succeed on the merits, should their claims survive the Motions under consideration herein.

A. *Ohio's Immunity from Suit*

The Court will first consider the State's immunity from suit in federal court.

The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." This immunity extends to states against suits brought by their own citizens (even though the text does not expressly state as much). *See Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Furthermore, the Amendment applies not only to legal claims, but to suits seeking injunctive relief against a state. *See Cory v. White,* 457 U.S. 85, 90–91, 102 S.Ct. 2325, 72 L.Ed.2d 694 (1982) (stating that it "would be a novel proposition indeed that the Eleventh Amendment does not bar a suit to enjoin the State itself simply because no money judgment is sought"). On the other hand, actions for injunctive relief against state officials may lie in certain situations. *See Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) (establishing the doctrine that Eleventh Amendment immunity will not always ap-

ply where plaintiff seeks prospective injunctive relief against state officials for alleged violations of controlling constitutional or other federal law). Though not technically a jurisdictional issue, in that Eleventh Amendment protections may be waived by a state, *see Idaho v. Coeur d'Alene Tribe of-Idaho,* 521 U.S. 261, 267, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997), where such is not waived, as is the undisputed case herein, the Supreme Court has treated a state's absolute protection from suit as tantamount to a jurisdictional bar to a federal court's ability to hear the case. *See, e.g., Seminole Tribe,* 517 U.S. 44, 76, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

 With respect to the federal and state claims which concern it (Counts I, III, V, VII, IX & XI), the State must be dismissed because it is immune from suit. The ODRC must also be dismissed as it is nothing more than a sub-unit of the State. To the extent it is *sui juris,* it is so through its Director, Wilkinson. In his official capacity, Wilkinson, too, is immune from suit under the Eleventh Amendment, insofar as Plaintiffs seek damages. *See Cory v. White,* 457 U.S. 85, 89, 102 S.Ct. 2325, 72 L.Ed.2d 694 (1982); *Worcester County Trust Co. v. Riley,* 302 U.S. 292, 296, 58 S.Ct. 185, 82 L.Ed. 268 (1937). As it concerns these matters, State Defendants' Motion to Dismiss is SUSTAINED.

 Therefore, of the State Defendants, only Wilkinson remains, and he does so only to the extent he has been sued for damages in his individual capacity, and to the extent Plaintiffs seek to enjoin him from engaging in ongoing unconstitutional or unlawful conduct in his official capacity as the Director of the ODRC (under the *Ex parte Young* doctrine). With this in mind, the Court shall consider the State Defendants' Motion to Dismiss along with that of the Telephone Defendants.

B. *Constitutional Claims (42 U.S.C. § 1983) (Counts I, III, V & VII)*

 Plaintiffs' constitutional claims are brought pursuant to 42 U.S.C. § 1983, which provides a civil cause of action to any citizen of the United States against any person who, under color of state law, deprives the citizen of "any rights, privileges, or immunities secured by the Constitution and laws of the United States." *Christy v. Randlett,* 932 F.2d 502, 504 (6th Cir.1991) (citations omitted). In order to succeed on a § 1983 claim, a plaintiff must prove two elements: (1) that he was deprived of a right secured by the Federal Constitution or laws of the United States; and (2) that he was subjected to this deprivation by a person acting under the color of state law. *See Searcy v. City of Dayton* 38 F.3d 282, 286 (6th Cir.1994). "By its terms, § 1983 creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." *Gardenhire v. Schubert,* 205 F.3d 303, 310 (6th Cir.2000) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)).

Although they have expressed their right to raise the issue at a later time, Telephone Defendants do not, herein, address the question of whether they were acting under color of law when they engaged in the allegedly unlawful conduct which underlies Plaintiffs' action. (Doc. # 42 at 6 n. 4.) As such, the Court will accept for purposes of ruling on the Telephone Defendants' Motion that the defects with Plaintiffs' Amended Complaint, should any exist, do not relate to their invocation of § 1983 for a cause of action, but, rather, to their reliance on the underlying constitutional rights on which the § 1983 claims are based, and which they claim have been violated.

### 1. *Equal Protection and First Amendment (Counts I and III)*

For reasons which will be explained below, the Court finds it beneficial to address Plaintiffs' Equal Protection Clause and First Amendment claims together.

Plaintiffs argue that they, as persons who frequently receive telephone calls from prison inmates, are discriminated against as a class, in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. In general, equal protection claims come in two varieties. *See Vacco v. Quill,* 521 U.S. 793, 799, 117 S.Ct. 2293, 138 L.Ed.2d 834 (1997); *Richland Bookmart, Inc. v. Nichols,* 278 F.3d 570, 574 (6th Cir.), *cert. denied,* —— U.S. ——, 123 S.Ct. 109, 154 L.Ed.2d 33 (2002). *First,* the Equal Protection Clause has been found to protect individuals from being unfairly treated under the law on an arbitrary basis, based solely on their status as members of a certain class of persons (i.e., class-based discrimination). *See, e.g., City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Generally, where a law discriminates on the basis of certain "suspect classifications," such as race, alienage, or national origin, it will withstand equal protection scrutiny only if it is narrowly tailored to serve a compelling state interest (i.e., the "strict scrutiny" standard). *See id.* On the other hand, because all legislation classifies at some level of abstraction, outside of those few well recognized "suspect classifications," legislation will satisfy the strictures of the Equal Protection Clause so long as the law is rationally related to a legitimate state interest (i.e., the "rational basis" standard). *See id.*[7]

*Second,* irrespective of any suspect classification, the Equal Protection Clause has been interpreted to protect against infringements on certain "fundamental rights" basic to all Americans, whether or not such rights are explicitly guaranteed by the text of the Constitution. *See, e.g., Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (invoking Equal Protection Clause in striking down a law that restricted male inmates' fundamental right to procreate); *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (invoking Equal Protection Clause in striking down a law that restricted the fundamental right of interstate travel); *Police Dept. of the City of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) (invoking Equal Protection Clause in striking down an ordinance which impinged upon the fundamental right to picket and therefore express one's views).[8] These same cases demonstrate that laws which impinge on identifiable fundamental rights are generally subject to strict scrutiny. Whether a particular right claimed by a plaintiff is "fundamental" is a question of law for courts to decide. In making its determination, a court is not to make comparisons of the claimed right with other fundamental rights which have been firmly established by prior cases. *See San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1, 33, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). It must, rather, assess whether the right claimed by the plaintiff is explicitly or implicitly guaranteed by the Constitution. *See id.* (emphasis added).

---

**7.** Gender-based classifications are subject to an "intermediate scrutiny" standard, and will be upheld only if the law "substantially relates" to a "sufficiently important" government interest. *See Cleburne,* 473 U.S. at 441, 105 S.Ct. 3249.

**8.** The *Mosley* Court recognized that while it analyzed the question under the Equal Protection Clause, it was obviously interrelated with the fundamental First Amendment right of free speech. 408 U.S. at 95, 96, 92 S.Ct. 2286.

As a final comment on the proper standard of analysis, where prison regulations are the subject of a plaintiff's attack, the Supreme Court has abrogated the use of strict scrutiny in favor of a universally applicable rational basis standard of analysis: provided that such regulations are "reasonably related to legitimate penological interests," they will be deemed constitutionally sound. *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). In other words, regardless of the alleged constitutional violation, the strict scrutiny standard will not be utilized in deciding the merits of the policies at issue in this case.

In Count I of their Amended Complaint, Plaintiffs do not expressly state that a fundamental right of theirs has been denied or impinged upon. On the face of their pleadings, it appears that the sole basis for this equal protection claim is that they, as "persons who receive phone calls from prisoners," have been subjected to an "invidious and unreasonable" classification. (Amend.Compl.¶¶ 63.) This language is indicative of a class-based equal protection claim. Nevertheless, in their Memorandum in Opposition (Doc. # 46), they blend the distinct Equal Protection Clause strands, arguing not only that they have been discriminated against as a class, but that their fundamental rights of free of speech and association have been impinged.

Obviously, the rights of free speech and free association are fundamental in our society. Be that as it may, they are expressly protected by the First Amendment, and, from a constitutional purist's perspective, it would seem that any alleged violation of such should be stated pursuant to a First Amendment claim, not as a claim under the Fourteenth Amendment. However, constitutional jurisprudence has not always been so precise, and the lines between distinct protections have often been blurred.[9] A classic example of this is *Mosley, supra,* wherein the Supreme Court grafted what was essentially a First Amendment analysis onto its Equal Protection Clause analysis, holding that a municipal ordinance which prohibited all pick-

---

9. As once observed by Justice Brennan, "[c]laims of interference with enjoyment of fundamental rights have ... occupied a rather protean position in our constitutional jurisprudence." *Maher v. Roe,* 432 U.S. 464, 484, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977)(Brennan, J., dissenting). At times, claims of violations of fundamental rights have been entertained under the Due Process Clause of the Fourteenth Amendment, under the guise of "substantive" due process. *See Washington v. Glucksberg,* 521 U.S. 702, 720–21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997)(citing cases and observing "that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition") (internal quotation and citation omitted). At other times, as noted, alleged violations of fundamental rights have been entertained under the Equal Protection Clause of the Fourteenth Amendment. *See, e.g., Harper v. Virginia State Bd. of Elections,* 383 U.S. 663, 670, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (citing cases and stating that "[w]e have long been mindful that where fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined."). To add to the muddle, the Privileges or Immunities Clause has recently been invoked as the guarantor of the fundamental right to travel, *see Saenz v. Roe,* 526 U.S. 489, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999), even though thirty years earlier, in *Shapiro v. Thompson, supra,* the Court reached the identical result, on indistinguishable facts, under an Equal Protection Clause analysis. In truth, whether invoked under the Equal Protection Clause, the Due Process Clause, the Privileges or Immunities Clause, or a more explicit provision of the Constitution, the fundamental rights analysis is the same. This history has led some to observe that the Supreme Court's Fourteenth Amendment jurisprudence is in disarray. *See, e.g., Saenz,* 526 U.S. at 527, 119 S.Ct. 1518 (Thomas, J., dissenting).

eting within 150 feet of a school, except that which was peaceful and related to labor disputes, violated the Equal Protection Clause "because it makes an impermissible distinction between labor picketing and other peaceful picketing." 408 U.S. at 94, 92 S.Ct. 2286; *see also id.* at 99, 92 S.Ct. 2286 (holding that "[b]ecause picketing plainly involves expressive conduct within the protection of the First Amendment," any impingements upon that right are subject to strict scrutiny under the Equal Protection Clause); *Carey v. Brown*, 447 U.S. 455, 461–62, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980) ("When government regulation discriminates among speech-related activities in a public forum, the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully scrutinized.").[10]

To the extent the Plaintiffs' Equal Protection Clause claim stated in Count I is premised on an alleged violation of their fundamental right to free speech and association, the Court will consider it jointly with their claim arising under the First Amendment claim stated in Count III. Before it gets to that analysis, however, the Court will address the "class-based" aspect of the Plaintiffs' Equal Protection Clause claim.

◼ The starting point for analyzing whether a law or policy violates the Equal Protection Clause by discriminating against a particular class of persons is the determination of whether an identifiable class has been singled out thereunder, and the litmus test of that determination is whether "all persons similarly situated" are treated equally thereunder. *See Maharg, Inc. v. Van Wert Solid Waste Mgmt. Dist.*, 249 F.3d 544, 556 (6th Cir.2001). The alleged class-based line drawing of which Plaintiffs complain concerns their alleged isolation as a group of persons who regularly receive telephone calls from prison inmates. Though surely implicated, it is not discrimination against inmates with which Plaintiffs take issue. Indeed, not being inmates themselves, they would likely not have standing to do so. Thus, the first question to be answered is whether persons who receive phone calls from inmates are similarly situated to those in the general public who do not, the argument being that if they are, their inability to obtain competitive calling rates vis-a-vis their communications with said inmates amounts to unequal (i.e., irrational) treatment under the law.

While the proposed class on which the Court must focus does not include inmates themselves, the Court agrees with Defendants, and the cases upon which they rely

**10.** In contrast to its equal protection jurisprudence, the Supreme Court has held that the Due Process Clause *may not* be invoked to prosecute an alleged violation of a fundamental right if such right has explicit constitutional protection under a more specific provision. *See Albright v. Oliver*, 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). Sixth Circuit cases reinforce this superficial distinction. For example, the Sixth Circuit recently stated that "fundamental rights are incorporated against the states" via the "substantive component" of the Fourteenth Amendment's Due Process Clause. *Brandenburg v. Housing Auth. of Irvine*, 253 F.3d 891, 900 (2001) (citing *Beckwith v. City of Daytona Beach*

*Shores*, 58 F.3d 1554, 1562 (11th Cir.1995)). Citing *Albright*, the *Brandenburg* court, proceeding under the substantive due process rubric, held that one could not bring a § 1983 claim under the Due Process Clause for an alleged violation of a right explicitly protected by the First Amendment. In contrast, in *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. The Michigan Gaming Control Bd.*, 276 F.3d 876, 879 n. 1, the Sixth Circuit recognized that where an alleged First Amendment violation "implicates a constitutionally protected fundamental right, the right to freedom of speech," an Equal Protection Clause claim will also lie.

for support, that the status of Plaintiffs' "class" cannot be viewed without taking into account its relationship with the status of the inmates with whom they wish to converse. The District Court of the Western District of Kentucky has captured this point succinctly:

> Plaintiffs argue that the recipients of inmate calls are similarly situated to the recipients of non-inmate calls. The Court finds this a questionable proposition. Because inmates initiate the calls, the recipients are necessarily constrained by whatever security measures are appropriate to place on the inmates themselves. The connection between the inmates and the recipients of their calls cannot be severed. It is the relationship to inmates alone that defines the group. If security precautions affect the telephone services that are available to inmates, this will inevitably impact the inmate call recipients. Thus, the real question is whether inmates and non-inmates are similarly situated.

*Daleure*, 119 F.Supp.2d at 691. Finding first that inmates are not similarly situated to non-inmates, the *Daleure* court went on to find that the corollary is also true: recipients of calls from inmates are not similarly situated to recipients of calls from non-inmates. *Id.See also Murray v. Dosal*, 150 F.3d 814, 818 (8th Cir.1998) ("Prisoners are not similarly situated to non-prisoners."); *Scher v. Chief Postal Inspector*, 973 F.2d 682, 683–84 (8th Cir. 1992) (same); *Hrbek v. Farrier*, 787 F.2d 414, 417 (8th Cir.1986) (same).

This Court agrees that because the status of inmates cannot be considered similar to that of non-inmates, it necessarily follows that at those times when Plaintiffs communicate via telephone with inmates, they cannot expect to be treated in similar fashion as they and others expect to be treated at those times when they communicate with non-inmates via telephone. The only way Plaintiffs could state an equal protection claim under the class-based discrimination strand of Equal Protection Clause jurisprudence would be to state that they have been treated differently than other groups of persons who receive collect calls from prison inmates. They have not done so. As such, on this basis, their equal protection claim (Count I) must fail.

To the extent Count I is based on the alleged violation of Plaintiffs' fundamental rights of free speech and association, it dovetails with Count III, which alleges violations of those same rights directly under the First Amendment. As noted above, although asserting First Amendment rights under an Equal Protection Clause cause of action would appear redundant, the right to do so has support in the case law of the Supreme Court and the Sixth Circuit. *See Mosley, supra; Carey, supra; Lac Vieux Desert Band of Lake Superior Chippewa Indians v. The Michigan Gaming Control Bd.*, 276 F.3d 876, 879 n. 1 (6th Cir.2002). Under either constitutional provision, the analysis is the same.

Although it is not clear how the First Amendment rights of the Plaintiffs have been threatened in this case,[11] it would be

---

11. The only issue here is the cost of one particular form of communication. There is nothing in the pleadings indicating that the right to physically visit inmates has been hampered, save for the inconvenience of travel itself (a factor which in no way can be attributed to any of the Defendants). Nor is there anything in the pleadings indicating that the right to correspond by mail has been hampered, or that the collect calling plans have hampered attorneys' abilities to provide their clients with adequate access to judicial process. Finally, there is no content-based restriction on what inmates and Plaintiffs may discuss over the phone. *See Bell v. Wolfish*, 441 U.S. 520, 551, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). While higher calling rates may give rise to a cognizable "economic injury" for purposes of demonstrating standing, *see,*

improper to dismiss their First Amendment claim and the fundamental rights aspect of their equal protection claim at this stage in the litigation. As Defendants point out, regardless of alleged constitutional violations, prison regulations are valid if they are "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89, 107 S.Ct. 2254. However, inmates do not lose all First Amendment protections once they enter the prison gates, and as Plaintiffs point out, prisoners are entitled to reasonable telephone access. *See Washington v. Reno*, 35 F.3d 1093, 1100 (6th Cir.1994). In Count III, Plaintiffs allege that they are subject to "exorbitant rates" and "are denied adequate service by the defendants." The Court must accept the facts as plead for purposes of ruling on Defendants' Motions to Dismiss, and it would be impossible to conclude at this stage in the litigation that Plaintiffs can demonstrate "no set of facts" upon which relief, under the First and Fourteenth Amendments, might be granted. For example, if Plaintiffs could show that the costs are so exorbitant that they are unable to communicate with their incarcerated family members, friends or clients, then relief might be warranted.

With that said, it should also be reiterated that Plaintiffs' burden is great. In considering the merits of Plaintiffs' claims, the Court will give, as it must, a great deal of deference to prison administrators and their regulations. *See Thornburgh*, 490 U.S. at 410, 109 S.Ct. 1874; *Bazzetta v. McGinnis*, 124 F.3d 774, 779 (6th Cir. 1997). As the Supreme Court has noted:

Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system. [internal quotations and citations omitted.] The fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration.

*Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977). As an additional point to be noted, the allegation that the State benefits from large commissions on the telephone contracts established for use by inmates is not necessarily probative to the Plaintiffs' claims. The Ohio Revised Code clearly dictates how such revenue is to be spent, at least in the state-operated institutions. *See* Ohio Rev.Code § 5120.132. As it is, the revenue is deposited into an account maintained and utilized for various programs for the direct benefit of prison inmates. Thus, even if the setting of arguably cost-prohibitive rates can give rise to an inference that the policy is unreasonable under the First Amendment, this inference seems countered, not supported, by the allegation that the State realizes a sizable income in the form of commissions on the telephone contracts, given that the very individuals whose interests the Plaintiffs hold close to them, i.e., their incarcerated friends, family and clients, are the ones who reap the financial benefit of this alleged income, not the State's general treasury.

For the moment, though, Plaintiffs have stated a viable claim under the Equal Protection Clause (Count I), to the extent it is premised on violations of their fundamen-

---

*e.g., Linton v. Commissioner of Health and Environment, State of Tennessee*, 973 F.2d 1311, 1316 (6th Cir.1992), Plaintiffs still must assert a viable legal theory on which relief can be obtained in order to prevail on the merits, and it is questionable whether the

First Amendment presents a viable theory under these facts. *Cf. Washington v. Reno*, 35 F.3d 1093, 1100 (6th Cir.1994) (holding that the First Amendment protects reasonable, not unlimited, telephone access).

tal rights of free speech and association, and under the First Amendment (Count III).

Accordingly, with respect to Plaintiffs' equal protection claim (Count I) stemming from alleged class-based discrimination, Ohio Defendants' and Telephone Defendants' Motions to Dismiss are SUSTAINED. As to Count I, insofar as it stems from alleged violations of fundamental rights of free speech and association, and as to Count III, alleging violations under the First Amendment, the Motions are OVERRULED.

### 2. *Procedural and Substantive Due Process (Count V)*

Plaintiffs assert that the collect calling plans in place are violative of their procedural and substantive rights guaranteed by the Due Process Clause of the Fourteenth Amendment. The Court disagrees. As an initial matter, the Court notes that the respective parties herein, as is frequently done, tend to blend the separate concepts of procedural and substantive due process. The Due Process Clause of the Fourteenth Amendment prohibits states from depriving any citizen of "life, liberty, or property, without due process of law." Procedural due process is concerned with just that, process, i.e., notice and hearing. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), provides an example of such a claim. Therein, the Supreme Court determined that a non-tenured university instructor had no property or liberty interest in his job, and, therefore, was not entitled to a hearing by the university before it decided not to renew his contract. 408 U.S. at 578, 92 S.Ct. 2701. In contrast, substantive due process is concerned with the nature of the right at issue, irrespective of process. *See Wash-*

*ington v. Glucksberg,* 521 U.S. 702, 721, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (stating that the Due Process Clause prohibits government from infringing upon certain fundamental liberties "no matter what process is provided" unless the infringement is narrowly tailored to served a compelling state interest) (citation omitted). For example, in *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), the Supreme Court held that the "right to marry" is one of the "basic civil rights of man," which a state cannot infringe arbitrarily without violating the Due Process Clause of the Fourteenth Amendment. 388 U.S. at 12, 87 S.Ct. 1817.

The Court will address Plaintiffs' distinct theories in turn.

#### a. *procedural due process*

 Procedural due process is concerned with the sufficiency of notice and hearings prior to adverse state action.[12] To establish that a due process violation has occurred, Plaintiff must show that she had a property or liberty interest as such is contemplated by the Fourteenth Amendment, and that such was taken from her in a manner insufficient under the safeguards of the Fourteenth Amendment. *See Miller v. Lorain County Bd. of Elections,* 141 F.3d 252, 259 (6th Cir.1998); *Roth,* 408 U.S. at 569, 92 S.Ct. 2701. "When protected interests are implicated, the right to some kind of prior hearing is paramount" before that interest may be deprived by the state. *Roth,* 408 U.S. at 570, 92 S.Ct. 2701. *See also Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 545–46, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) ("The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due

---

**12.** The Court will reiterate here that Telephone Defendants have not raised their nongovernmental status as a defense to Plaintiffs' theories of recovery, so the Court does not concern itself here with state action, or the lack thereof, with respect to them.

process requirement."); *Duchesne v. Williams,* 849 F.2d 1004, 1006–08 (6th Cir. 1988).

In *Roth,* the Supreme Court noted that property interests are defined under state law. 408 U.S. at 576–78, 92 S.Ct. 2701. Herein, the lone property interest identified by Plaintiffs as having been taken by Defendants is their money. (Doc. # 46 at 16.) Money is certainly a property interest. *Herrada v. City of Detroit,* 275 F.3d 553, 556 (6th Cir.2001). The problem with Plaintiffs' procedural claim is that Defendants did not take their money in a constitutionally infirm way. The prospective recipient of a collect call is in complete control over whether she chooses to accept the call and thereby relinquish her money to pay for it. There is no taking of which to speak, such as where the government confiscates property or forecloses its commercial use by fiat or legislation, and any argument that the State has created a property interest in free or cheap collect calls would not be well taken.

Liberty interests are a bit more difficult to define, *see Roth,* 408 U.S. at 571, 572, 92 S.Ct. 2701, but they, too, may be creatures of state law, or of the Due Process Clause itself. *See Woodard v. Ohio Adult Parole Auth.,* 107 F.3d 1178, 1183 (6th Cir.1997). The Court need not delve too deeply into liberty interest doctrine because it is enough to note that Plaintiffs have failed to give the Court anything of substance to consider. The only interest to which they point is that which is created by the First Amendment. This argument fails because, unlike the Equal Protection Clause, the Due Process Clause cannot be invoked for the protection of rights guaranteed by more specific provisions of the Constitution, such as the First Amendment. *See Albright v. Oliver,* 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994); *United States v. Lanier,* 520 U.S. 259, 272 n. 7, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997).

As the pleadings, even when accepted as true, do not indicate that any liberty or property interest of Plaintiffs' was taken by Wilkinson or Telephone Defendants, the Court finds that a procedural due process claim upon which relief can be granted has not been stated. Accordingly, as to Count V, to the extent they are premised on violations of procedural due process, Ohio Defendants' and Telephone Defendants' Motions to Dismiss are SUSTAINED.

b. *substantive due process*

Substantive due process rights are akin to, if not actually the same thing as, fundamental rights arising under the Equal Protection Clause.[13] *See supra* note 9. The analysis begins with the same considerations as those in the procedural due process context, namely, an examination of whether Plaintiffs have been deprived of a property or liberty interest. However, whereas procedural due process is con-

---

**13.** For example, in *Skinner,* the Supreme Court held that the right to procreate is a fundamental right, the outright denial of which violates the Equal Protection Clause. 316 U.S. at 541, 62 S.Ct. 1110. Chief Justice Stone, concurring, rejected the equal protection argument, contending that it would have been more appropriate for the Court to reach the same result under the Due Process Clause. *Id.* at 545, 62 S.Ct. 1110 (Stone, C.J., concurring). Later, in *Glucksberg,* the Court characterized *Skinner* as a substantive due process case, holding that the right to have children is a " 'liberty' specially protected by the Due Process Clause." 521 U.S. at 720, 117 S.Ct. 2258 (citing *Skinner, supra* ). *Cf. Harper,* 383 U.S. at 675, 86 S.Ct. 1079 (Black, J., dissenting) (accusing the majority using the Equal Protection Clause as a replacement for the "old 'natural-law-due-process formula' " in holding that a poll tax unconstitutionally infringed upon the fundamental right to vote).

cerned primarily with process itself, i.e., the right to notice and the right to be heard, substantive due process is concerned primarily with the nature of the interest at stake.[14] Thus, the emphasis of each inquiry is distinct. The only "fundamental" or "substantive" interests identified by Plaintiffs are those of freedom of speech and freedom of association.[15] As already noted, because the First Amendment is specifically concerned with such an interest, claims arising from such but brought separately under the Due Process Clause lack merit. *See Albright,* 510 U.S. at 273, 114 S.Ct. 807.

Accordingly, to the extent they relate to Plaintiffs' claim for violations of substantive due process (Count V), Ohio Defendants' and Telephone Defendants' Motions to Dismiss are well taken, and they are SUSTAINED.

### 3. *Contracts Clause (Count VII)*

■ In Count VII, Plaintiffs allege that the collect calling plans established by Defendants violate their rights guaranteed by the Contracts Clause, which prohibits the States from impairing the obligation of contracts. The contracts which Plaintiffs allege are being violated are their own individual, residential telephone service agreements with their respective telephone service providers.

■ The Contracts Clause is impaired where there is a contractual relationship, a change in law impairs that contractual relationship, and the impairment is substantial.[16] *See Wojcik v. City of Romulus,* 257 F.3d 600, 612 (6th Cir.2001). As an initial matter, nothing in any of the prison policies which form the basis for Plaintiffs' suit relates to the agreements between Plaintiffs and their residential

14. To add to the due process soup, there is yet another strand of substantive due process, concerning "executive acts" (as compared to legislative acts). *See County of Sacramento v. Lewis,* 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). As with substantive due process concerning legislative acts, where an executive act is at issue, the analysis begins with the identification of a particular fundamental right, and proceeds to assess the manner by which such right was deprived. Whereas the test generally employed with respect to legislative deprivations of substantive due process is whether the legislation is "narrowly tailored to serve a compelling state interest," *Glucksberg,* 521 U.S. at 721, 117 S.Ct. 2258 (citation omitted), the test of whether an executive act violates substantive due process is whether it "shocks the conscience." *Lewis,* 523 U.S. at 846–47, 118 S.Ct. 1708; *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952). Of course, determining whether conduct "shocks the conscience" presents one more amorphous test, for which no easy definition or bright line rule exists. *See Lewis,* 523 U.S. at 847–55, 118 S.Ct. 1708. Defendants contend that the establishment of the collect calling plans was the product of executive, not legislative, action. Plaintiffs, for their part,

argue that it is legislative in effect, and therefore should be treated as such. Suffice it so say that even if the Court were to treat the actions at issue as executive in nature, it would find that the claim is barred by *Albright, supra,* which held that alleged violations of specific provisions of the Constitution, such as the First Amendment in this case, cannot be repackaged under the Due Process Clause.

15. Plaintiffs also allege that the collect calling plan agreements operate to deprive them of their "right to consult with counsel." (Amend.Compl.¶ 78.) This makes no sense. Plaintiffs are not inmates themselves, as all parties to this dispute tend to lose sight of with some frequency.

16. The strictures of the Contracts Clause apply to legislative acts of government. *See Barrows v. Jackson,* 346 U.S. 249, 260, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953). As noted *supra* note 14, Defendants contend that the actions of which Plaintiffs complain are actions of the executive branch of government, not the legislature; Plaintiffs contend the opposite is true. The Court need not probe this issue, as the claim fails either way.

telephone service providers. Plaintiffs' residential agreements are simply not impaired by the fact that inmates may only call them by way of the collect calling plans at issue. Furthermore, nothing in the pleadings indicates that the State of Ohio has changed the status quo from where it was when Plaintiffs entered into their residential telephone service agreements. It has long been settled that a contract cannot be impaired by a law in effect at the time of the making of the contract, for that is the law which binds the contract. *See Home Building & Loan Assn. v. Blaisdell*, 290 U.S. 398, 429–430, 54 S.Ct. 231, 78 L.Ed. 413 (1934). For obvious reasons, nothing in the pleadings suggests that any of the Plaintiffs had a contractual expectation, under the laws of Ohio existing at the time they obtained residential telephone service, that, in the event someone they knew might some day go to prison in Ohio, they would be able to communicate with that individual by telephone in accordance with the rates and service options of their choice. Indeed, given the interest of prison administrators in regulating the conduct of prison inmates, such a right would not appear to be one a private telephone company could give.

As to Plaintiffs' Contracts Clause claim (Count VII), Ohio Defendants' and Telephone Defendants' Motions to Dismiss are SUSTAINED.

C. *Sherman Antitrust Act (federal antitrust claim) (Count IX)*

 Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, states:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal.

In Count IX, Plaintiffs aver that Defendants have acted in violation of this law,

unreasonably restraining trade by depriving the market for inmate-initiated telephone calls in Ohio of competition. 15 U.S.C. § 15(a) provides them with a cause of action. At this juncture, the Court will only address this claim with respect the alleged agreements between Telephone Defendants and State Defendants. The Court will revisit this claim, as it relates to the alleged agreements between Telephone Defendants and County Defendants, in its discussion of County Defendants' Motion to Dismiss.

 Assuming *arguendo* that monopolistic control of the prison inmate collect calling market in Ohio is a restraint of trade, this claim is barred by the state action doctrine. The Sherman Act was not intended to restrain states from conducting their affairs as they see fit. *See Parker v. Brown*, 317 U.S. 341, 351, 63 S.Ct. 307, 87 L.Ed. 315 (1943). An otherwise monopolistic restraint of trade will not give rise to a Sherman Act violation where it stems from a clearly articulated and affirmatively expressed state policy, and where said policy is actively supervised by the state itself. *See California Retail Liquor Dealers Assoc. v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). Where an actively supervised state policy is identified, the immunity extends not only to the state, but to the private parties acting pursuant to and in conformity with the state policy. *See Southern Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 56–57, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985).

Both elements of the immunity exception are met here. Regarding the State's expressed policy, Ohio Defendants direct the Court's attention to provisions in Chapter 125 of the Ohio Revised Code, which require that all administrative departments, of which the ODRC is one, purchase necessary services using some

method of competitive procurement. *See* Ohio Rev.Code §§ 125.05, 125.07, 125.071, & 125.072. Under such a system, service contracts are awarded on a monopolistic basis. Ohio Defendants contend that this provision clearly reveals that it is the policy of Ohio to install monopolistic telephone systems in its prisons. Though they are relevant, the Court finds it both imprudent and unnecessary to rely upon these provisions of law. It would be imprudent because the competitive procurement process is only required where the service to be purchased costs more than a certain dollar figure (adjusted in relation to the consumer price index). *See id.* § 125.05(A) & (D). Thus, the applicability of these provisions turns on a question of fact, i.e., the cost of installing the collect calling systems, which the Court may not consider when ruling on a Rule 12(b) motion to dismiss.

However, it is unnecessary to turn to these provisions because Plaintiffs' own pleadings establish that the State has awarded monopolistic contracts to the respective Telephone Defendants. A state cannot express its policy in any clearer terms than by actually engaging in the practice which the purported policy prescribes. Plaintiffs argue that "[a]bsent a clearly articulated state policy permitting prison officials to enter into anti-competitive telephone service agreements, the defendants are not immune under the state action doctrine." (Doc. # 46 at 24.) This contention overlooks the fact that the ODRC *is* the State of Ohio. The Director of the ODRC is vested with total authority to prescribe the rules and regulations for all correctional facilities in Ohio. Thus, when the ODRC establishes a collect calling telephone system in an Ohio correctional institution, that *is* the clear and articulated policy of Ohio. For the very same reason, the second prong of the state action doctrine is also met. The policy just described is more than merely supervised by the State of Ohio; the State is

itself an active participant. It is the State, acting through the Director of the ODRC, that solicited, implemented, and maintains the calling plans.

The cases cited by Plaintiffs do not hold anything to the contrary. *Community Communications Co., Inc. v. Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982), is of no help because that case involved a municipal ordinance enacted by the City of Boulder, Colorado, not a policy of the State itself. Boulder had argued that its ordinance, which restricted a cable television operator's ability to compete, had the force of a Colorado State policy given that Colorado had granted Boulder "home rule" authority. 455 U.S. at 54, 102 S.Ct. 835. Rejecting this argument, the Court stated that municipalities are not themselves sovereign, *id.* at 50, 102 S.Ct. 835 (citing *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 412–13, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978)), and held that although Colorado had granted home rule to Boulder, it could not be stated that the State had contemplated every legislative action to be taken by Boulder, such that the latter's acts could be regarded as the State's. *Id.* at 55, 102 S.Ct. 835. Insofar as Plaintiffs' claim is directed toward State Defendants, and toward Telephone Defendants' agreements with the State of Ohio, the *Boulder* holding is of no moment.

In *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), the Court addressed an antitrust claim against the Virginia State Bar Association, which had issued ethical code advisory opinions indicating that it would impose sanctions on attorneys who did not follow the established fee schedules of local (member) bar associations. 421 U.S. at 776–78, 95 S.Ct. 2004. The result of these opinions was that attorneys did not waver from any such schedules, and competition

was restrained. *Id.* at 778, 95 S.Ct. 2004. The Supreme Court held that while the state bar association was a state agency, there was no evidence that its ethical opinions had the force of law or carried the imprimatur of the Virginia Supreme Court, or that the local fee schedules were "compelled by direction of the State acting as a sovereign." *Id.* at 791, 95 S.Ct. 2004. The state action doctrine, therefore, was inapplicable. By comparison, in this instance, the ODRC has not restrained trade among competing telephone companies; rather, it has made a decision concerning the immediate business of the State itself. Vested with absolute authority to regulate the State's prison system, it has determined that a monopolized collect calling telephone system is in the State's best interest. That is the *de jure* policy of Ohio.

In *California Liquor Dealers v. Midcal Aluminum,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), the Supreme Court examined a California law that restricted wine wholesalers from selling any brand of wine to a retailer at a price below that established by the wine producers. Although it had clearly expressed a policy favoring price controls (for economic reasons), California itself did not fix the wine prices, nor did it supervise the pricing system for reasonableness. 445 U.S. at 100, 100 S.Ct. 937. The extent of its involvement was the enforcement of the price control after it had already been established. *Id.* at 105, 100 S.Ct. 937. The Court held that this did not demonstrate active supervision, and that a state could not override the Sherman Act's application to private parties merely by declaring anticompetitive conduct lawful. *Id.* at 106, 100 S.Ct. 937; *see also Parker,* 317 U.S. at 351, 63 S.Ct. 307. Similarly, *324*

*Liquor Corp. v. Duffy,* 479 U.S. 335, 107 S.Ct. 720, 93 L.Ed.2d 667 (1987), involved a New York State law similar in effect to the one invalidated in *Midcal,* and it, too, was deemed illegal under the Sherman Act. As was the case with California in *Midcal,* New York did not actively supervise the reasonableness of the price restraints imposed by private parties under the law. 479 U.S. at 344–45, 107 S.Ct. 720. The issue in *Federal Trade Comm'n v. Ticor Title Ins. Co.,* 504 U.S. 621, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992), was whether several states could authorize title insurance companies to fix their fees for performing title searches. 504 U.S. at 627, 112 S.Ct. 2169. The states, Wisconsin and Montana,[17] had regulatory agencies in place to oversee the reasonableness of the fixed fees, but it was found that none exercised their regulatory duties to any appreciable extent. *Id.* at 629–30, 112 S.Ct. 2169. Rejecting the analysis of the Third Circuit Court of Appeals, which had held, in reliance on a First Circuit opinion, that a fully staffed state regulatory agency is itself ample evidence of active supervision, *see id.* at 637, 112 S.Ct. 2169 (citing 922 F.2d 1122, 1136 (3rd Cir.1991) (citing *New England Motor Rate Bureau, Inc. v. FTC,* 908 F.2d 1064, 1071 (1st Cir.1990))), the Supreme Court held that the "mere potential for state supervision is not an adequate substitute for a decision by the State." *Id.* at 638, 112 S.Ct. 2169. Given that Wisconsin and Montana did not actively supervise the price fixing of the title insurance companies, as in *Midcal* and *324 Liquor,* state action immunity was not warranted. *Id.*

The Court finds that *Midcal, 324 Liquor,* and *Ticor Title Insurance* are all inapposite. Had the State of Ohio enacted

**17.** The regulatory regimes of two other states, Arizona and Connecticut, were also implicated, but to the extent the Supreme Court addressed the question of whether the states had demonstrated active supervision, it focused only on the regimes of Wisconsin and Montana. 504 U.S. at 632, 112 S.Ct. 2169.

a law allowing telephone companies to fix collect calling rates *for the general public*, with *de minimis* oversight, this case would be very different. That is not what has transpired, however. Indeed, this case is not even about horizontal conspiracy (i.e., agreement between competitors not to compete). The situation is more complex. First and foremost, the State of Ohio, through the ODRC, operates every prison in Ohio, which is a very particularized and unique market. Itself being one of the principals to the activity at issue, the State, through the ODRC, has contracted with a single telephone service provider for each correctional institution to provide outgoing calling services. This is a vertical agreement, and the telephone service provider with whom the ODRC contracts acts on behalf of the State.[18] Furthermore, whomever the carrier may be, the rate it charges must then be approved by the Public Utility Commission of Ohio ("PUCO"). *See* Ohio Rev.Code § 4909.15.[19] The result is a calling plan, at each institution, established at the request of the State, pursuant to the State's inherent obligation to administer its correctional facilities, which charges a rate approved by the State. This is unquestionably legal, and the rationale of *Midcal* and its progeny does not apply.

When an inmate requests to use a direct dial telephone service, or some other alternative method of calling, it is not the telephone service provider that tells her "no"; it is, rather, the State of Ohio that does so. This is truly a unique monopolistic situa-

tion, the likes of which the Supreme Court and the Sixth Circuit have not addressed. This Court finds that the state action doctrine must apply with its greatest vigor in a case, such as this, where a state government has contracted with an outside vendor to provide a service on behalf of the state itself. The fact that the service rates are subject to approval by the relevant state regulatory agency only strengthens the point.[20] The Seventh Circuit, addressing practically identical facts and circumstances arising in Illinois, put this type of claim in its proper perspective:

> Indeed the plaintiffs' real argument has nothing to do with any horizontal conspiracy; it is rather that a monopolist, namely the State of Illinois (and its subdivisions), exercising as it does an iron control over access to the inmate market, has rented pieces of the market to different phone companies, in much the same way that an airport will charge a high fee to concessionaires eager to sell to the captive market represented by the airline passengers who perforce spend time in the airport. *Cf. Elliott v. United Center*, 126 F.3d 1003 (7th Cir. 1997). The concessionaires will pass on much of the fee to their customers, who will thus pay a higher than competitive price. States and other public agencies do not violate the antitrust laws by charging fees or taxes that exploit the monopoly of force that is the definition of government. They have to get reve-

---

**18.** Short of developing its own telecommunication system, this service must be contracted out.

**19.** On the public utility rate fixing process, *see generally* Chapter 4909 of the Ohio Revised Code. On the powers and authority of PUCO vis-a-vis the enforcement and supervision of the filed rate system, *see* Chapter 4905.

**20.** Indeed, unlike in *Midcal* and the other cases involving horizontal agreements, the

oversight involvement of the regulatory agency in this case is really an irrelevant point. The PUCO regulation is purely a creature of state law. Other than the First Amendment, which would probably bar a cost prohibitive calling rate, nothing in federal law prevents a state from allowing a true monopolistic calling rate (i.e., an unregulated rate). Thus, what demonstrates the "active supervision" in this case is not the involvement of the PUCO, but the fact that the State itself is a principal participant to the vertical agreement.

nue somehow, and the "somehow" is not the business of the federal courts unless a specific federal right is infringed. Nor do the persons with whom the states contract violate the antitrust laws by becoming state concessionaires, provided those persons do not collude among themselves or engage in other anticompetitive behavior, of which charging high prices as a state concessionaire is not a recognized species.

*Arsberry,* 244 F.3d at 566.

The reality of government operations is that monopolistic control of services, whether procured by the government for its own use, or provided for third parties on behalf of the government, produces efficiencies. It would be pioneering indeed for a federal court to hold that Congress, in enacting the Sherman Act, intended to prohibit states from entering into exclusive service contracts necessary and efficient to their own operations. The State of Ohio has exclusive control over its prison telephone system as much as it does over its buildings, its parks, and all other government property. If it chooses to contract out the operation of the phone system to a private party, that does not make it any less a phone system of the State itself. Likewise, individuals have no greater legal right, *under the Sherman Act,* to question the rate that a state charges for an inmate-initiated call than they do the rate that a state charges for admission to a state park. This may not be the best thing for "consumers," or competing vendors who do not win the contracts, but it is part and parcel to the sovereign prerogative.

Plaintiffs pray for an order from the Court that they and inmates are entitled to the benefits of the free market of telephone services. Their request is not well taken. The Sherman Act guarantees them nothing other than that which the State of Ohio, as sovereign, deems appropriate in this situation.

Accordingly, as it relates to Plaintiffs' Sherman Act claim (Count IX), to the extent that claim concerns agreements between Telephone Defendants and State Defendants only, said Defendants' Motions to Dismiss are SUSTAINED.

**D.** *Valentine Act (state antitrust claim) (Count XI)*

With respect to Wilkinson, the sole remaining State Defendant, the Court will also sustain Ohio Defendants' Motion as it relates to the Valentine Act claim. As it does with respect to the Sherman Act, the state action doctrine precludes Plaintiffs from suing the State of Ohio, as represented by Wilkinson, under for alleged state antitrust violations. *See Thaxton v. Medina City Bd. of Educ.,* 21 Ohio St.3d 56, 488 N.E.2d 136, 137 (1986). Accordingly, Ohio Defendants' Motion is SUSTAINED as to Plaintiffs' claim arising under Ohio's Valentine Act (Count XI), as is Telephone Defendants' Motion to the extent the Valentine Act claim concerns any agreements they are alleged to have with the State of Ohio.

(With respect to Telephone Defendants' alleged agreements with County Defendants, the Court will address the Valentine Act pleadings together with its discussion of the of County Defendants' Motion to Dismiss.)

**E.** *Conclusion*

In sum, to the extent Plaintiffs' claims are against the State of Ohio and the ODRC, and insofar as Plaintiffs seek damages against Wilkinson in his official capacity, Ohio Defendants' Motion to Dismiss is well taken, and it is SUSTAINED as to all of the claims against them (Counts I, III, V, VII, IX & XI), pursuant to Fed.R.Civ.P. 12(b)(1). *See Seminole Tribe, supra.* In-

sofar as Plaintiffs seek injunctive relief against Wilkinson in his official capacity, and damages against him in his individual capacity, Ohio Defendants' Motion is SUSTAINED as to Counts V, VII, IX & XI, pursuant to Fed.R.Civ.P. 12(b)(6), and OVERRULED as to Counts I and III.

Insofar as these same claims are stated against Telephone Defendants, stemming from their alleged agreements with the State of Ohio, said Defendants' Motion to Dismiss is well taken as to Counts V, VII, IX & XI, and SUSTAINED pursuant to Fed.R.Civ.P. 12(b)(6). Telephone Defendants' Motion is OVERRULED as to Counts I and III. Insofar as said claims are concerned with the alleged agreements between Telephone Defendants and County Defendants, the merits of each shall be discussed below.

IV. *Telephone Defendants' Motion to Dismiss (Doc. # 43) (as it relates to Plaintiffs' Claim under the Telecommunications Act (Count X))*

47 U.S.C. § 201 states:

(a) It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor; and, in accordance with the orders of the Commission, in cases where the Commission, after opportunity for hearing, finds such action necessary or desirable in the public interest, to establish physical connections with other carriers, to establish through routes and charges applicable thereto and the divisions of such charges, and to establish and provide facilities and regulations for operating such through routes.

(b) All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful: *Provided,* That communications by wire or radio subject to this chapter may be classified into day, night, repeated, unrepeated, letter, commercial, press, Government, and such other classes as the Commission may decide to be just and reasonable, and different charges may be made for the different classes of communications: *Provided further,* That nothing in this chapter or in any other provision of law shall be construed to prevent a common carrier subject to this chapter from entering into or operating under any contract with any common carrier not subject to this chapter, for the exchange of their services, if the Commission is of the opinion that such contract is not contrary to the public interest: *Provided further,* That nothing in this chapter or in any other provision of law shall prevent a common carrier subject to this chapter from furnishing reports of positions of ships at sea to newspapers of general circulation, either at a nominal charge or without charge, provided the name of such common carrier is displayed along with such ship position reports. The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter.

(Underline in original.)

Section 202(a) states:

It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class

of persons, or locality to any undue or unreasonable prejudice or disadvantage.

In Count X, Plaintiffs aver that Telephone Defendants have violated this law ("Telecommunications Act") by imposing upon them collect calling rates developed pursuant to "unjust," "unreasonable," and "illegal" agreements with the State and County Defendants. Sections 207 and 208 provide a person harmed by violations of the Telecommunications Act the opportunity to elect an exclusive remedy, the former providing a right to bring suit in federal district court, the latter providing a right to file a complaint with the Federal Communication Commission ("FCC"). There is no indication that Plaintiffs have previously filed a complaint with the FCC, so the Court can assume they have properly invoked § 207 in filing this claim.

Telephone Defendants raise as their defense the "filed rate doctrine," which the Court will now address. Telephone service providers are required under federal law to file with the FCC a schedule of all charges and the "classifications, practices, and regulations affecting such charges." 47 U.S.C. § 203(a). The providers may not charge any other rate other than that on file. *Id.* § 203(c). Under the filed rate doctrine, "[d]eviation from [the filed rate] is not permitted upon any pretext." *See American Telephone and Telegraph Co. v. Central Office Telephone, Inc.* ("*AT & T*"), 524 U.S. 214, 222, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998). This doctrine is an applicable defense to claims brought under the Telecommunications Act. *See id.*

■ The Court agrees that the filed rate doctrine bars this claim. Plaintiffs' Telecommunications Act claim is premised entirely on the perceived illegality of the collect calling agreements. There are no allegations that the Telephone Defendants are not providing rates or services in conformity with their filed schedules of rates and the like, only that they are not providing services in conformity with such rates and terms to Plaintiffs' liking. Plaintiffs have merely repackaged the entirety of their other pleadings under a Telecommunications Act cause of action. This will not lie, and Plaintiffs have failed to state a claim under 47 U.S.C. § 207. That section allows a party to challenge a carrier's compliance with its rate schedule; it does not allow the party to challenge the rate itself, or to bring a cause of action for constitutional or antitrust violations.[21] Given that all Plaintiffs seek is a modification of the rates they are charged for accepting collect calls, the claim is barred by the filed rate doctrine, as this Court does not have the authority to override the dictates of 47 U.S.C. § 203(c).

As further support of its argument, Telephone Defendants aptly note that the FCC has considered this very issue (i.e., the cost of inmate-initiated collect calls), within the broader context of the high cost of operator-assisted calls in general. Because its findings and rulings are pertinent to the facts of this case, they are worthy of the Court's consideration. In 1990, Congress addressed numerous consumer complaints of the high cost of operator-assisted telephone services, and the lack of information available to consumers on how such costs were calculated and incurred. *See* Pub.L. 101–435 § 2 (Congressional Statement of Findings), *reprinted at* 47 U.S.C.A. § 226 (2001), Historical and Stat-

---

21. Plaintiffs argue that the filed rate doctrine is not concerned with the monopolistic contracts which prisons offer to the various Telephone Defendants. This may be true, but it is irrelevant, as the Telecommunications Act is also not a surrogate for the Sherman Antitrust Act. For the same reason, it is also irrelevant that, as Plaintiffs argue, the filed rate doctrine is no defense to constitutional violations, as it is 42 U.S.C. § 1983 that provides Plaintiffs with a vehicle to raise such violations, not 47 U.S.C. § 207.

utory Notes.[22] Congress was principally concerned with contracts between businesses which make telephones available to the public for operated-assisted use, such as hotels, hospitals, airports, and the like (denominated in the law as "aggregators"), and the telephone operators who service those phones and provide the gateway to connecting telephone signal carriers. *See id.* The primary complaint was that the operators were preventing, or "blocking," consumers from accessing the long-distance carrier of their choice in order to charge their own high rate, which benefitted the amenable aggregator in the form of larger commissions. *See id.* In response, Congress enacted the Telephone Operator Consumer Services Improvement Act, Pub.L. 101–435, 104 Stat. 987 (codified as amended at 47 U.S.C. § 226) ("TOCSIA"), which, among other things, outlawed blocking, *see* 47 U.S.C. § 226(c)(1)(B), and directed the FCC to promulgate rules to further protect consumers of such services.

In *In the Matter of Amendment of Policies and Rules Concerning Operator Serv. Providers and Call Aggregators,* 1996 WL 94014, 11 F.C.C.R. 4532 (March 5, 1996) ("First Report"), the FCC addressed, among other topics, how, or if, the TOCSIA should be applied to the collect calling phone systems at the nation's state prisons. In response to its request for feedback, the regulating bodies of three states advocated for treating prisons as aggregators, to be regulated with all others. First Report ¶ 27. However, the majority of commentators disfavored treating prisons as aggregators, generally contending that the "exceptional circumstances" surrounding prison administration made the issue unique. *Id.* ¶ 28. The FCC decided not to classify prisons as aggregators, but expressed deep concern for the high rates paid by those who accept collect calls from inmates, such as Plaintiffs herein.[23] *Id.* ¶¶ 29 & 30.[24]

In a separate proceeding, *In the Matter of Billed Party Preference for InterLATA 0+ Calls,* 1996 WL 435546, 11 F.C.C.R. 7274 (June 6, 1996) ("Second Report"), the FCC considered whether inmates should be allowed to access the long-distance carriers of their choice and/or whether rate caps should be imposed on collect calls. Recognizing that prisons typically block inmates' access to long-distance carriers other than the ones with which they have contracted on a monopolistic basis, and having already determined that the TOCSIA was not applicable to prisons, the FCC questioned the viability of providing consumers with a choice of carriers within the prison context. Second Report ¶¶ 48 & 49. Instead, it invited comment on alternative remedies. *Id.* ¶ 49. In its follow-up report, 13 F.C.C.R. 6122 (Jan. 29, 1998) ("Third Report"), "persuaded by comments of the United States Attorney General, other federal officials, and nearly all who have commented on this issue," the FCC reiterated that consumer choice of carriers was not an option within the prison context. Third Report ¶ 57.[25] The FCC also rejected, as it had done with

---

**22.** As Congress noted, the historical predicate to this problem was the breakup of AT & T.

**23.** As the Court has previously remarked, Ohio has established a fund for prisoner services into which *all moneys* received from phone plan commissions must be deposited. Ohio Rev.Code § 5120.132. While this does not lessen the financial impact on Plaintiffs, it does weaken their argument that the large revenues taken in by the correctional facilities are motivated by avarice.

**24.** The FCC had actually ruled in 1991 that prisons are not within the definition of "aggregator." *See In the Matter of Policies and Rules Concerning Operator Service Providers,* 6 F.C.C.R. 2744 (Apr. 15, 1991) ¶ 15. In its Report of March 5, 1996, it was actually reaffirming its previous decision.

**25.** The FCC noted that Florida allows its prisoners to use pre-paid debit cards. Third Report ¶ 57. However, there was no indication

operator-assisted phone calls in general, imposing rate caps or price benchmarks for the carriers to follow. *Id.* ¶ 59. On this point, it stated that the existing obligation to set just and reasonable rates, imposed upon carriers by 47 U.S.C. § 201, along with its concern that price caps would be adopted by carriers as price floors, made this option undesirable. *Id.*

In the end, the FCC adopted a rule requiring operators servicing inmate-initiated calls to identify themselves orally to any potential recipient of an interstate collect call, and then give the potential recipient the option to obtain billing information, broken down on a per minute basis, prior to accepting the call. *Id.* ¶ 60. The optional service is free-of-charge and the potential recipient is not billed for any phone connection time prior to her actual acceptance of the collect call. *Id.* By giving a potential recipient the option of learning in advance the exact cost breakdown, on a minute-by-minute basis, of the call he or she is being asked to accept, the FCC expressed the hope that some of the "abu-

sive practices that have led to complaints," notably, general consumer ignorance as to the billing structure, could be eliminated. *Id.* In the event progress was not made, the agency retained the right "to proceed on a case-by-case basis, should the rules we adopt herein not lead to reasonable rates for calls from inmate phones." *Id.* ¶ 59.[26] Indeed, the FCC investigation into inmate-initiated calls across the country, and the notice and comment process related thereto, has been extensive. *See Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunication Act of 1996,* 67 Fed.Reg. 17009 (Apr. 9, 2002) (Final Rule).[27]

The importance of this history should be self-evident. Rate setting and related relief is the bailiwick of the FCC. The Telecommunications Act cannot, in any logical sense, be understood as providing a means for striking down or enjoining the rates imposed upon Plaintiffs as a result of their accepting collect calls from Ohio inmates. Their remedy lies with the FCC, or Congress itself.[28] Accordingly, as it relates to

that this actually reduces the cost of the phone calls.

26. The rule, in its final form, is published at 47 C.F.R. § 64.710 (2002) ("Operator services for prison inmate phones").

27. Somewhat ironically, in the ongoing FCC notice and comment proceedings, the FCC has faced pressure from the providers of prison telephone services in states where state-imposed caps on rates have limited, allegedly, the operators' abilities to recoup their operating expenses. *See IMPLEMENTATION OF THE PAY TELEPHONE RECLASSIFICATION AND COMPENSATION PROVISIONS OF THE TELECOMMUNICATIONS ACT OF 1996,* 1996 WL 658824, 11 F.C.C.R. 21233 (Nov. 8, 1996) (Order on Reconsideration). The basis for the telephone company complainants' grievance is 47 U.S.C. § 276, which, in general, prohibits Bell telephone service providers that also provide payphone services from discriminating against competing payphone service providers (i.e., a Bell system carrier cannot deny service to calls

originating from a payphone owned by another company), and requires the FCC to establish equitable rates and access to yet-to-be established payphone markets. Prison inmate telephone services are considered payphones for the purpose of the Act. 47 U.S.C. § 276(d). The FCC has twice rejected the carriers' argument that § 276 preempts a state's right to set its own caps, or, in the alternative, that it allows the carriers to charge a surcharge to recoup what it loses on each call on account of the rate cap. *See* 1996 WL 658824, 11 F.C.C.R. 21233 (Nov. 8, 1996) (Order on Reconsideration); 17 F.C.C.R. 3248 (February 21, 2002) (Order on Remand and Notice of Proposed Rulemaking).

28. As made clear by the FCC, its rulings only apply to "interstate" calls. At the state level, concerning "intrastate" calls, Ohio also requires that all telephone calling rates be "just and reasonable," as fixed by the PUCO. Ohio Rev.Code § 4909.15. The relief provided to consumers who feel rates are unjust or unrea-

Plaintiffs' claim under the Telecommunications Act (Count X), Telephone Defendants' Motion to Dismiss is SUSTAINED.

## V. County Defendants' Motion to Dismiss (Doc. # 43)

### A. Individual Counties

■ As noted by the Court in its entry dismissing Montgomery County as a Defendant, counties, as political entities, are not *sui juris;* they are held accountable through their elected representatives, to wit, their commissioners. (Doc. # 52 at 2.) For the reasons stated with respect to its order dismissing Montgomery County from this case (Doc. # 52), the Counties of Miami, Greene, Madison, and Butler, as well as all other Unknown Counties, are hereby dismissed. With respect to them, County Defendants' Motion to Dismiss (Doc. # 43) is well taken, and is hereby SUSTAINED, pursuant to Fed.R.Civ.P. 12(b)(1).

■ The same result holds for the several county sheriffs named herein in their official capacities. The claims against them are not for individual actions, but for policies implemented by the departments they run, pursuant to their obligations to operate their respective county jails. Such claims implicate the counties they serve. Because law enforcement agencies, too, are not *sui juris,* being no more than arms of the government of which they are a part, the sheriffs must be dismissed from this action. *See, e.g., Jones v. Marcum,* 197 F.Supp.2d 991, 997 (S.D.Ohio 2002). With respect to them, County Defendants' Motion to Dismiss (Doc. # 43) is well tak-

en, and is hereby SUSTAINED, pursuant to Fed.R.Civ.P. 12(b)(1).

Accordingly, references hereinafter to County Defendants will imply only the respective Boards of County Commissioners.

### B. Due Process and Contracts Clause Claims (Counts VI & VIII)

The Court's previous discussion on the merits of Plaintiffs' due process and Contracts Clause claims apply with equal force to the identical claims related to the agreements between County Defendants (now limited to the county commissioners) and Telephone Defendants (Counts VI & VIII). As they relate to those claims, arising under 42 U.S.C. § 1983, County Defendants' and Telephone Defendants' Motions to Dismiss are SUSTAINED, pursuant to Fed.R.Civ.P. 12(b)(6).

### C. Equal Protection and First Amendment Claims (Counts II & IV)

To the extent Plaintiffs attempt to state an equal protection claim against County and Telephone Defendants on the basis of class-based discrimination (Count II), it is without merit for the reasons previously discussed. As they relate to such a claim, County and Telephone Defendants' Motions to Dismiss are SUSTAINED, pursuant to Fed.R.Civ.P. 12(b)(6).

To the extent Plaintiffs base their equal protection claim as to these Defendants (Count II) on alleged infringements of their fundamental rights of free speech and association, and as to their First Amendment claim against these Defen-

---

sonable is the right to file a complaint with the PUCO. *Id.* §§ 4909.24 & 4909.25. As a matter of state law, Plaintiffs have no separate remedy to challenge the reasonableness of intrastate calling rates in this Court. Their reliance on *AT & T Communications of Ohio, Inc. v. Public Utilities Comm'n of Ohio,* 88 Ohio St.3d 549, 728 N.E.2d 371 (2000), is

misplaced, as that case involved a direct appeal to the Ohio Supreme Court from a final order of the PUCO. Only the Ohio Supreme Court may review PUCO orders. *See* Ohio Rev.Code § 4903.12; *State ex rel. Cleveland Elec. Illuminating Co. v. Cuyahoga County Court of Common Pleas,* 88 Ohio St.3d 447, 727 N.E.2d 900, 903–04 (2000).

dants (Count IV), and insofar as the County and Telephone Defendants' Motions to Dismiss relate to same, the Motions are OVERRULED. For the reasons already stated above in the Court's discussion of the identical claims stemming from the alleged relationships between State and Telephone Defendants, the Court finds that it would be more appropriate to consider the viability of these claims pursuant to arguments for and against summary judgment. Again, Plaintiffs have a significant burden to overcome, but it would be premature to find that they cannot do so.[29] Accordingly, as to these claims (Counts II & IV), County Defendants' and Telephone Defendants' Motions to Dismiss are OVERRULED.

### D. Sherman Act (federal antitrust claim) (Count IX)

■ Regarding the Sherman Act claim, as it relates to telephone service agreements between County Defendants and Telephone Defendants, given that the individual county officials were named in their official capacity only, to the extent Plaintiffs seek damages, interest on damages, costs, or attorney's fees, the Sherman Act claim against the county officials is barred by the Local Government Antitrust Act, 15 U.S.C. § 35(a). That same Act bars Plaintiffs from collecting damages, interest on damages, and costs or attorney's fees from Telephone Defendants, to the extent Telephone Defendants acted at the direction of the county officials. *Id.* § 36(a).

To the extent Plaintiffs seek injunctive relief against the individual County Defendants and Telephone Defendants, on account of the alleged agreements between the two parties, further review of the state action doctrine is required.

■ On their own, local governments are not sovereign, and their independent actions are not exempt from federal antitrust laws. *See City of Lafayette,* 435 U.S. at 412–13, 98 S.Ct. 1123. Thus, whether conduct of a local government that would typically qualify as anticompetitive for federal antitrust purposes actually gives rise to antitrust liability depends, as it does with respect to private parties, on whether the local government "engag[es] in the challenged activity pursuant to a clearly expressed state policy." *Hallie v. Eau Claire,* 471 U.S. 34, 40, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985). By "clearly expressed," it is not meant that the Court must find that the Ohio General Assembly "stated explicitly that it expected [the County Defendants] to engage in conduct that would have anticompetitive effects," only that the authority of the County Defendants to act as they have was contemplated, and that their conduct is a logical result of the broad authority given to them. *Id.* at 42, 44, 105 S.Ct. 1713. "No legislature can be expected to catalog all of the anticipated effects of a statute of this kind." *Id.* at 43, 105 S.Ct. 1713. County Defendants need not show that they were compelled by the State of Ohio to engage in the conduct they did. *See id.* at 45, 105 S.Ct. 1713. Moreover, whereas a private party must be able to show that a state actively supervised its conduct in order to avail itself of state action doctrine immunity, County Defendants need not. *See id.* at 46, 105 S.Ct. 1713. This is because the posture of a local government is substantively different than that of a private actor.

Where the actor is a municipality, there is little or no danger that it is involved in

---

**29.** It should also be noted that the State and counties may have different reasons for operating their collect calling systems in the manner they do, and the individual Defendants should be prepared, should they submit motions for summary judgment, to demonstrate how their respective systems are reasonable.

a *private* price-fixing arrangement. The only real danger is that it will seek to further purely parochial public interests at the expense of more overriding state goals. This danger is minimal, however, because of the requirement that the municipality act pursuant to a clearly articulated state policy. Once it is clear that state authorization exists, there is no need to require the State to supervise actively the municipality's execution of what is a properly delegated function.

*Id.* at 47, 105 S.Ct. 1713 (emphasis in original).

As discussed, in *Boulder*, 455 U.S. at 55–56, 102 S.Ct. 835, the Supreme Court held that where a state grants general "home rule" governing authority to a municipality, that grant of general authority is too vague to impute any future actions of the municipality to the state, for purposes of invoking the state action doctrine. *Hallie* provides a contrast. In that case, several unincorporated towns brought an antitrust suit against a neighboring city, alleging that the city, operating with a legal monopoly on sewage treatment in its area, refused to provide as much to the unincorporated towns' sewage. The effect of this policy was that it negated the towns' respective abilities to establish sewage lines of their own. Nevertheless, the Court held that the anticompetitive conduct had been authorized by the state (of Wisconsin), as was demonstrated by the fact that the state had granted the city the discretion to not link its sewage lines to those of the unincorporated towns. 471 U.S. at 42–43, 105 S.Ct. 1713. It did not matter that the state had not explicitly granted the

city the right to monopolize sewage treatment; it sufficed that such conduct was a logical result of granting the city the right not to link its sewage lines to the unincorporated areas. *Id.* at 43–44, 105 S.Ct. 1713.

■ This case presents a close question. Ohio has placed its county jails in the charge of the county sheriffs. *See* Ohio Rev.Code § 341.01. In turn, the sheriff is to govern and regulate the jails according to the standards established by the ODRC. *See id.* The investigation and supervision of county jails rests with the DPCS, a division of the ODRC. *See id.* § 5120.10. With respect to county jails equipped to house inmates for more than five days, the ODRC allows an inmate one local call each week to a relative, employer, friend, attorney, or clergy. Ohio Admin. Code § 5120:1–8–08(B)(1). Additional calls to counsel are permitted for inmates yet to be sentenced. *Id.* § 5120:1–8–08(B)(2). Inmates without friends or family in the area are permitted one long-distance *collect call* per week. *Id.* § 5120:1–8–08(B)(3). The Court finds that this latter provision expresses the clear policy of the State of Ohio that counties are to equip their jails with collect calling phone systems.[30] That finding, however, is not the end of the story. It remains to be answered whether counties are required to limit their inmate phone service systems to single operator systems.

A county's board of commissioners is vested with the power to provide for the operation of its jails in accordance with the standards set by the ODRC. *See* Ohio Rev. Code § 307.01(A). As with the State of Ohio, county services are generally pro-

---

**30.** Inmates at jails equipped to house inmates up to five days are allowed at least one telephone during their period of incarceration in addition to an initial phone call to a person of their choice, and any which they make for purposes of retaining an attorney. Ohio Ad-

min. Code §§ 5120:1–10–01(E)(1) & (2) and 5120:1–10–08(B). There is no specification that the call be made collect, but the authority to establish telephone policies rests with the sheriff. *Id.* § 5120:1–10–08(A).

cured through a competitive bidding process. *See id.* § 307.86. Of course, exactly how County Defendants actually procured their inmate telephone service systems is a question of fact which the Court may not address at this juncture. This is significant at this stage of the litigation in light of the fact that the counties of Ohio are not on equal sovereign footing as the State itself. As to the latter, the Court need not concern itself with how or why the ODRC chooses not to allow inmates and Plaintiffs a choice of telephone carriers; it is enough to note that the State is sovereign, and that such a choice is its sovereign right to make. With respect to the counties, on the other hand, they enjoy no such sovereign status. The Sherman Act applies to them, unless it is found that they are acting pursuant to a policy contemplated by the authority vested in them by the State of Ohio.

At this stage of the litigation, questions of fact exist which prevent the Court from making a finding that Plaintiffs cannot prevail on their Sherman Act claim under any set of facts. The Court believes that the disposition of the claim will turn on whether the facts come to demonstrate that this case is more akin to *Boulder* or to *Hallie.* The question of fact presented is whether the Ohio General Assembly or the ODRC, vested as it is with complete au-

thority to supervise the operations of county jails, contemplated that in giving county commissioners the authority to provide for jails in conformity with ODRC regulations, and county sheriffs the authority to operate the jails in conformity with the same, the counties would, in turn, establish their collect calling phone systems on a monopolistic basis. The Court finds that such a determination cannot yet be made. To the extent they have entered into agreements with the individual County Defendants, Telephone Defendants, too, may not yet be dismissed from this case.

One final observation must be raised. 47 U.S.C. § 276(b)(1) gives the FCC authority to regulate competition among payphone service providers.[31] Correctional institution inmate telephone service is included within the definition of "payphone service" under this Act. 47 U.S.C. § 276(d). The fact that a federal agency has been given regulatory authority in the area of law directly implicated by this case raises the question of whether the Court should abstain from hearing this case under the "primary jurisdiction doctrine." *See United States v. Western Pac. R.R. Co.,* 352 U.S. 59, 63–70, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956), and its progeny.

County Defendants did not address this issue; Telephone Defendants did so only in their Reply Memorandum.[32] (Doc. # 51

31. This provision touches upon a concern other than that contained at 47 U.S.C. § 226. Section 226 is concerned with consumers' right to equal access of the telephone service provider of their choice when they dial from a telephone made available to them by a business which is providing the use of the telephone as part of its proprietary operations (defined as an "aggregator"). Section 276, by contrast, is concerned with competition among *payphone* service providers. The FCC has ruled that it cannot, under § 226, regulate prisons as aggregators. *See In the Matter of Policies and Rules Concerning Operator Service Providers,* 1991 WL 637530, 6 F.C.C.R. 2744 (Apr. 15, 1991) ¶ 15; First Report, *su-*

*pra,* ¶ 29. On the other hand, Congress quite clearly has given the FCC the authority to regulate prison collect calling systems as payphone services under § 276.

32. State Defendants raised a separate primary jurisdiction argument, but such concerned the fairness of the rates. (Doc. # 41 at 42.) Telephone Defendants raised the same argument in a footnote. (Doc. # 42 at 32 n. 15.) For purposes of evaluating Plaintiffs' Sherman Act claim, the rate setting of a single inmate telephone service provider, which was the subject of Plaintiffs' Telecommunications Act claim against Telephone Defendants, is not the issue. Rather, at issue is the ability of

at 19–21.) As such, Plaintiffs have not had an opportunity to respond. Accordingly, should Defendants choose to submit, as the Court expects they will, subsequent motions for summary judgment, they are directed to address this question in addition to any arguments on the merits of Plaintiffs' Sherman Act claim.

For purposes of guidance, the Court finds that the following questions should be addressed in any motions for summary judgment that Defendants may file:

1) Under any law of Ohio or regulation of the ODRC, was it contemplated by the State of Ohio that County Defendants would award exclusive (i.e., monopolistic) contracts to the respective Telephone Defendants, under which inmate access to collect calling telephone service would be limited to a single telephone service provider? [33]

2) Irrespective of any state supervision of County Defendants' alleged conduct, was the conduct of Telephone Defendants actively supervised by the State of Ohio?

3) Inasmuch as the collect calling systems installed in the county jails of Ohio are deemed "payphone service" under 47 U.S.C. § 276(d), is the issue of how said systems should be opened to market competition within the primary jurisdiction of the FCC? [34]

Subject to the limitation on damages imposed by the Local Government Antitrust Act, 15 U.S.C. §§ 35 & 36, to the

extent Defendants' respective Motions to Dismiss relate to Plaintiffs' Sherman Act claim (Count X), they are OVERRULED.

E. *Valentine Act (state antitrust claim) (Count XI)*

With respect to the issue of injunctive relief, the identical considerations remain regarding Plaintiffs' Valentine Act claim (Count XI) against the County and Telephone Defendants. Accordingly, pursuant to the identical terms discussed above regarding the Sherman Act claim, to the extent Defendants' respective Motions relate to this claim and Plaintiffs' request for injunctive relief, they are OVERRULED. Furthermore, because the claim is properly stated at least insofar as Plaintiffs' seek such relief, the Court need not consider at this juncture whether damages would be available under the Valentine Act against these Defendants. This is an issue which can also be briefed in any subsequent motions for summary judgment. For the time being, to the extent Plaintiffs do seek damages thereunder, the respective Motions of the County and Telephone Defendants, as they relate to this claim, are OVERRULED.

VI. *Conclusion*

A. *State Defendants' Motion to Dismiss (Doc. # 41)*

As it pertains to the State of Ohio and the ODRC, and as it pertains to Wilkinson

---

would-be inmate telephone service providers to compete on an active basis for inmates' (Plaintiffs') business, and the right of correctional institutions to ignore such concerns by offering exclusive contracts. Obviously, a challenge to monopolistic control is ultimately a challenge to rates, but it is so only indirectly, and it poses a separate question for consideration.

33. As the Court has already found that the State clearly intended County Defendants to establish collect calling systems, the parties

are not to address that particular point any further. The sole issue is whether it was contemplated that such systems would be established pursuant to exclusive contracts.

34. Of course, nothing prevents the Court from entertaining this issue within the context of Plaintiffs' constitutional claims, as such claims are not within the primary jurisdiction of the FCC. *See Communications Workers of America v. Beck*, 487 U.S. 735, 743 n. 1, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988).

insofar as the Plaintiffs seek damages against him in his official capacity, State Defendants' Motion to Dismiss is SUSTAINED, pursuant to Fed.R.Civ.P. 12(b)(1), as to all of the claims applicable to them (Counts I, III, V, VII, IX & XI). To the extent Plaintiffs seek injunctive relief against Wilkinson in his official capacity, and damages against him in his individual capacity, the State Defendants' Motion is SUSTAINED, pursuant to Fed. R.Civ.P. 12(b)(6), as to Counts V, VII, IX & XI, and as to Count I, insofar as Plaintiffs' equal protection claim stems from an alleged class-based violation. As to Count I, insofar as Plaintiffs' equal protection claim against Wilkinson stems from an alleged violation of their fundamental rights of free speech and association, and as to Count III, the Motion is OVERRULED.

**B. Telephone Defendants' Motion to Dismiss (Doc. # 42)**

Regarding the Telephone Defendants' Motion to Dismiss, as it concerns the claims related to their alleged agreements with State Defendants, it is SUSTAINED, pursuant to Fed.R.Civ.P. 12(b)(6), as to Counts V, VII, IX & XI, and as to Count I, insofar as Plaintiffs' equal protection claim stems from an alleged class-based violation. Said Motion is also SUSTAINED with respect to the due process and Contracts Clause claims relating to the alleged agreements between them and the County Defendants (Counts VI & VIII), pursuant to Fed.R.Civ.P. 12(b)(6). Insofar as Plaintiffs' equal protection claim relating to the alleged agreements between Telephone Defendants and County Defendants (Count II) is premised on an allegation of class-based discrimination, Telephone Defendants' Motion is SUSTAINED with respect thereto, pursuant to Fed.R.Civ.P. 12(b)(6).

To the extent Plaintiffs seek damages from the Telephone Defendants under the Sherman Act (Count IX) for actions taken at the direction of County Defendants, pursuant to their alleged agreements with County Defendants, the Telephone Defendants' Motion is SUSTAINED pursuant to Fed.R.Civ.P. 12(b)(6). It is also SUSTAINED as to the Telecommunications Act claim (Count X), pursuant to Fed. R.Civ.P. 12(b)(6).

With respect to Plaintiffs' equal protection claims relating to the alleged agreements between Telephone Defendants and State Defendants (Count I), and those between Telephone Defendants and County Defendants (Count II), insofar as they are premised upon alleged infringements of Plaintiffs' fundamental rights of free speech and association, and with respect to Plaintiffs' First Amendment claims relating to the same alleged agreements (Counts II & IV), Telephone Defendants' Motion is OVERRULED. Said Motion is also OVERRULED with respect to the Sherman Act claim (Count IX), insofar as Plaintiffs seek injunctive relief against the alleged agreements between Telephone and County Defendants. Finally, said Motion is OVERRULED with respect to the Valentine Act claim against them (Count XI), insofar as it concerns their alleged agreements with the County Defendants.

**C. County Defendants' Motion to Dismiss (Doc. # 43)**

As to the several counties named herein, along with their sheriffs, named in their official capacities, as they are not *sui juris*, County Defendants' Motion to Dismiss is SUSTAINED as to the claims against them (Counts II, IV, VI, VIII, IX & XI), pursuant to Fed.R.Civ.P. 12(b)(1).

As to the several county commissioners, said Motion is SUSTAINED with respect to the due process and Contracts Clause claims against them (Counts VI & VIII), pursuant to Fed.R.Civ.P. 12(b)(6). Said

Motion is also SUSTAINED, pursuant to Fed.R.Civ.P. 12(b)(6), with respect to the equal protection claim against them (Count II), insofar as said claim is premised on alleged class-based discrimination. As well, the Motion is SUSTAINED with respect to the Sherman Act claim (Count IX), under Fed.R.Civ.P. 12(b)(6), insofar as Plaintiffs seek damages and associated costs and fees.

The Motion is OVERRULED with respect to the equal protection claim against them (Count II), insofar as said claim is premised on infringements of Plaintiffs' fundamental rights of free speech and association, and with respect to the First Amendment claim against them (Count IV). Said Motion is also OVERRULED with respect to the Sherman Act claim against them (Count IX), insofar as Plaintiffs seek injunctive relief, and with respect to the Valentine Act claim against them (Count XI).

### D. *Remaining Viable Claims*

To summarize, the following claims remain viable: 1) Count I, to the extent it states a claim under the Equal Protection Clause premised on alleged infringements of Plaintiffs' fundamental rights of free speech and association arising out of the alleged agreements between State and Telephone Defendants; 2) Count II, to the extent it states a claim under the Equal Protection Clause premised on alleged infringements of Plaintiffs' fundamental rights of free speech and association arising out of the alleged agreements between County and Telephone Defendants; 3) Count III, which states a claim under the First Amendment arising out of the alleged agreements between State and Telephone Defendants; 4) Count IV, which states a claim under the First Amendment arising out of the alleged agreements between County and Telephone Defendants; 5) Count IX, which states a claim under the Sherman Act, 15 U.S.C. § 1, to the extent Plaintiffs seek injunctive relief against County and Telephone Defendants; and 6) Count XI, which states a claim under Ohio's Valentine Act against County and Telephone Defendants for injunctive relief and damages.

In the event Telephone and County Defendants should submit motions for summary judgment, they are directed to address the questions posed by the Court in Part V of this Decision and Entry, concerning the applicability of the primary rate doctrine to Plaintiffs' Sherman Act claim (Count IX), in addition to any other arguments they may submit.

### E. *WorldCom Bankruptcy*

As a final matter, the Court must make mention of the fact that Defendant MCI Worldcom Network, Inc., now known as Worldcom, Inc. ("WorldCom"),[35] filed for Chapter 11 bankruptcy on July 21, 2002. *See In re WorldCom, Inc.*, Case No. 02–13533, 2002 WL 1732646 (S.D.N.Y. July 21, 2002). Such a filing operates as an automatic stay on these proceedings. *See* 11 U.S.C. § 362(a). Accordingly, before any further actions can be taken in this litigation, Plaintiffs must notify the Court whether they desire to dismiss WorldCom from this litigation, and proceed vis-a-vis the remaining Defendants, or otherwise comply with the stay of proceedings until WorldCom's bankruptcy action is resolved. *See id.* § 362(c).

Accordingly, Plaintiffs are to notify the Court, within 20 days of date, of their intentions with regard to this matter. In the meantime, with the exception of Plain-

---

**35.** Telephone Defendants notified the Court of this corporate name change in their Motion to Dismiss. (Doc. # 42 at 1 n. 1.)

tiffs' compliance with the Court's directive to notify, this action is stayed until further notice, and parties are not to proceed with any action related thereto, including the filing of motions for summary judgment, until such time. If Plaintiffs indicate that they intend to dismiss WorldCom and proceed with this litigation, the Court shall schedule a conference call to discuss further proceedings.